## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AXISTEL COMMUNICATIONS, INC., | Case No. 01-10005 (JJF) |
| NOVO NETWORKS GLOBAL SERVICES, INC., | |
| NOVO NETWORKS INTERNATIONAL SERVICES, INC., | Jointly Administered |
| E.VOLVE TECHNOLOGY GROUP, INC., | |
| NOVO NETWORKS OPERATING CORP., | |
| Debtors. | |

## MOTION FOR INTERIM AND FINAL ORDER (i) AUTHORIZING SECURED POSTPETITION FINANCING ON A SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, AND (ii) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby file this motion (the "Motion") for entry of an interim and final order (i) authorizing secured postpetition financing on a superpriority basis pursuant to 11 U.S.C. § 364, and (ii) scheduling a final hearing on the Motion, and in support thereof state as follows:

### Background

1.     On July 30, 2001 (the "Petition Date"), each of the Debtors, AxisTel Communications, Inc. ("AxisTel"), e.Volve Technology Group, Inc. ("e.Volve"), Novo Networks Global Services, Inc. ("NN Global"), Novo Networks International Services, Inc. ("NN International"), and Novo Networks Operating Corp. ("NNOC"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"). The Debtors are continuing in possession of their respective properties and operating their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code in these chapter 11 cases (the "Cases").

2.    The Debtors are communications services companies that provide voice and broadband services over a facilities-based network. The Debtors' network consists of digital switching, routing and signal management equipment, as well as digital fiber optic cable lines. The Debtors' network transmits voice, data, Internet and facsimile traffic within the United States and certain other countries.

3.    In September and October, 1999, e.Volve and AxisTel were acquired by a non-debtor eVentures, Inc., n/k/a Novo Networks, Inc. ("NNI"), the parent company of the subsequently formed debtor NNOC. In March 2000, as part of a corporate reorganization, NNOC was formed and became a direct wholly-owned subsidiary of NNI. In a subsequent corporate reorganization completed in November 2000, e.Volve and AxisTel became direct wholly-owned subsidiaries of NNOC. The other two debtors, NN Global and NN International, are direct subsidiaries of AxisTel.

4.    Following the acquisitions, the Debtors continued their historical business operations as wholly-owned subsidiaries of NNI. Their operations were funded from cash flow generated by operations and advances from NNI.

5.    The Debtors were not able to raise capital from external sources in amounts necessary to complete the build-out of their planned global network. In September 2000, the Debtors adopted a plan to consolidate their businesses to form a broadband services company that intended to provide data transport, Internet access and value added services to communications, Internet and applications service providers.

Implementation of this plan required that the Debtors greatly expand their existing networks both domestically and internationally by adding fiber optic transport capacity and sophisticated telecommunications equipment and increasing facilities to house both the new equipment and a greatly expanded sales staff. This network expansion plan required that the Debtors raise substantial additional capital, which the Debtors planned to raise from vendors and from one or more issuances of equity by NNI.

6. The Debtors began efforts to implement this plan in the fall of 2000. They approached numerous vendors of equipment and fiber capacity, aggressively hired industry veterans for sales and network management positions, identified and negotiated leases and collocation agreements and, through the efforts of NNI, retained JP Morgan to assist in the equity capital raise. During this time period, the Debtors continued to operate their historical, voice-based business. The Debtors pursued this plan until the end of the first quarter of calendar 2001.

7. Unfortunately, this business plan did not succeed as expected. After evaluating all their restructuring alternatives, the Debtors decided that seeking protection under chapter 11 of the Bankruptcy Code is the most prudent option.

8. For the fiscal year ended June 30, 2000, the Debtors had gross revenues of approximately $55 million, and their books and records reflected assets totaling approximately $38 million, and liabilities of approximately $16 million. For the three months ending March 31, 2001, the Debtors had gross revenues of approximately $19 million, as compared to approximately $16 million for the three months ending March 31, 2000. At the end of that period, the Debtors' assets totaled approximately $32 million, and their liabilities totaled approximated $22 million.

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## **Relief Requested**

10.     By this Motion, the Debtors respectfully request pursuant to 11 U.S.C. § 364 and Bankruptcy Rule 4001, the entry of an interim and final order (i) authorizing secured postpetition financing on a superpriority basis pursuant to 11 U.S.C. §364, and (ii) scheduling a final hearing.

11.     Uncertainty concerning the Debtors' financial condition has severely curtailed the availability of trade credit and acceptable credit terms and limits.  A steady and continual supply of products and services from such vendors and providers is essential to the Debtors' businesses.  In addition, the Debtors have experienced negative cash flow and insufficient working capital, and until their financial obligations and operations are restructured in chapter 11, it can be anticipated that this situation will continue.

12.     In order to continue to operate their businesses, the Debtors have determined, in the exercise of their sound business judgment, that a postpetition credit facility that permits them to obtain up to $1.6 million in new working capital is critical.  Moreover, the Debtors have determined, in the exercise of their sound business judgment, that the credit facility (described below) offered by their NNI  (the "Lender") offers the most attractive economic terms available.

13.     Prior to the Petition Date, the Debtors surveyed possible borrowing sources and contacted lenders of prospective sources of postpetition financing.  The

4

Debtors were unable to locate any entity that was willing to lend funds to the Debtors other than on a secured and superpriority basis. By virtue of the knowledge of the Debtors' businesses possessed by the Lender, the Debtors were able to negotiate a debtor-in-possession financing facility without experiencing the delays that would occur if a prospective lender not familiar with the Debtors were to conduct due diligence on the Debtors and their assets. Moreover, the Debtors have concluded that debtor-in-possession financing from the Lender presented the best terms, and thereby the best opportunity for the preservation of the Debtors' businesses.

14. Prior to the Petition Date, the Debtors engaged in good faith and extensive, arm's length negotiations with the Lender. Negotiating on behalf of the Debtors were (a) Executive Sounding Board Associates Inc. ("ESBA"), the Debtors' proposed financial advisor and restructuring consultant; (b) The Bayard Firm, P.A. ("Bayard"), the Debtors' proposed bankruptcy counsel; and (c) Steven R. Loglisci ("Mr. Loglisci"), Chief Executive Officer and/or President of each of the Debtors. ESBA and Bayard were retained by the Debtors prior to the Petition Date in preparation for the filing of these Cases. Mr. Loglisci became Chief Executive Officer and/or President of each of the Debtors in July 2001. These negotiations culminated in an agreement by the Lender to provide postpetition financing (the "DIP Financing") to the Debtors on the terms and conditions substantially as set forth in the form of Credit and Guaranty Agreement (the "DIP Loan Agreement") and the proposed form of interim order (the "Interim Order"), each of which is annexed hereto as Exhibit A and Exhibit B, respectively.

15. Pending a final hearing, the Debtors will be required to pay certain actual and necessary expenses as set forth in the budget (the "Budget") attached to the Interim Order. The Budget also sets forth the projected actual and necessary expenses of the Debtors on a weekly basis through November 30, 2001.

16. Significant elements of the DIP Loan Agreement and the related documents to be executed in connection with the DIP Loan Agreement and to which the DIP Loan Agreement refers (collectively, the "DIP Financing Documents") are as follows:[1]

| | |
|---|---|
| Borrower: | The Debtors |
| Lender: | Novo Networks, Inc. |
| Commitment Amount: | The credit facility pursuant to the DIP Loan Agreement (the "Facility") provides for a total commitment of up to $1.6 million (the "Commitment"). $1,200,000 of the Commitment shall be available in accordance with the DIP Loan Agreement until entry of a final order approving the Facility. |
| Term: | Borrowings shall be repaid in full, and the Commitment shall terminate, at the earliest of (i) November 30, 2001 (the "Maturity Date"), (ii) 30 days after the entry of the Interim Order if the Final Order (as hereinafter defined) has not been entered prior to the expiration of such 30-day period (the "Prepayment Date"), (iii) the date on which the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the effective date) occurs with respect to a plan of reorganization (a "Plan") that is confirmed pursuant to an order entered by the Bankruptcy Court in any of the chapter 11 cases of the Debtors (the "Consummation Date"), (iv) the closing of a sale |

---

[1] This summary is qualified in its entirety by reference to the provisions of the DIP Financing Documents. Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the DIP Loan Agreement or the Interim Order. This summary complies with Local Rule 4001-2.

of all or substantially all of the Debtors' assets and (v) the acceleration of the loans and the termination of the Commitment in accordance with the DIP Loan Agreement (together with the Maturity Date, the Prepayment Date and the Consummation Date, the "Termination Date").

**Priority and Liens:**

All obligations under the Facility shall at all times be

(i) entitled to superpriority claim status in the Cases, pursuant to section 364(c)(1) of the Bankruptcy Code,

(ii) secured by a perfected first priority lien on all unencumbered property, both real and personal, of the Debtors pursuant to section 364(c)(2) of the Bankruptcy Code, and

(iii) secured pursuant to section 364(c)(3) of the Bankruptcy Code, by a perfected junior lien on all property, both real and personal, of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the chapter 11 cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code;

subject in each case only to (x) in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Agreement), or an event that would constitute an Event of Default with the giving of notice or lapse of time or both, the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors, and any statutory committees appointed in the chapter 11 cases in an aggregate amount not in excess of $800,000 and (y) the payment of fees pursuant to 28 U.S.C. § 1930 ((x) and (y), together, the "Carve-Out") provided (a) following the Termination Date (as defined herein and in the DIP Loan Agreement), the Carve-Out for professional fees set forth in subsection (x) above shall be reduced by the amount of such allowed professional fees and disbursements paid at any time in the Cases, and (b) the Carve-Out shall not include professional fees and disbursements incurred in connection with the commencement and prosecution of any adversary proceeding or contested matter in which any party asserts any claims or causes of action against the Lender and/or challenges or raises any defense to the Obligations, the Credit Documents, the Superpriority Claims and/or the Liens of the Lender granted hereto

and in the DIP Loan Agreement. In addition, notwithstanding anything herein to the contrary, no Loans or any portion of the Carve-Out may be used to object to or contest in any manner, or raise any defenses to, the validity, perfection, priority or enforceability of the Obligations, the DIP Loan Agreement, the Superpriority Claims and/or the Liens of the Lender granted hereto and in the Credit Documents, or to assert any claims or causes of action against the Lender; and (c) no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors, or to the collateral securing such indebtedness.

<table>
<tr><td>Purpose:</td><td>Borrowings under the Facility shall be used for working capital purposes of the Debtors in accordance with the Budget or Amended Budget.</td></tr>
</table>

Purpose:

Borrowings under the Facility shall be used for working capital purposes of the Debtors in accordance with the Budget or Amended Budget.

Interest
Rate:

The prime lending rate which The Chase Manhattan Bank announces from time to time as its prime lending rate plus 3.0% payable on the Termination Date.

Conditions to
Initial Borrowings:

The obligation to provide the initial extension of credit shall be subject to the satisfaction of the following conditions:

(a) Not later than 10 business days following the Petition Date, entry of the Interim Order in the form attached as an exhibit to the DIP Loan Agreement as may be modified only with the approval of the Lender, which shall remain in full force and effect, and shall not have been stayed, reversed, amended, or modified in any respect; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such loans nor the performance by the Borrowers of any of their obligations thereunder shall be the subject of a presently effective stay pending appeal;

(b) All of the "first day orders" entered at the time of the Petition Date shall be reasonably satisfactory in form and substance to the Lender;

(c) Receipt of closing documents (including promissory note and security and pledge agreement) satisfactory in form and substance to the Lender;

(d) Legal opinion of counsel to the Debtors satisfactory to the Lender;

(e)     All corporate and judicial proceedings and all instruments and agreements in connection with the transactions among the Debtors and the Lender contemplated by the DIP Loan Agreement shall be satisfactory in form and substance to the Lender, and the Lender shall have received all information and copies of all documents or papers requested by the Lender;

(f)     The Lender shall have received from the Debtors a budget detailing the Debtors' anticipated cash receipts and disbursements for the period through the Maturity Date on a weekly basis and setting forth anticipated uses of the Commitment and such budget shall be satisfactory in form and substance to the Lender (the "Budget");

(g)     No material adverse change shall have occurred since July 30, 2001 in the condition (financial or otherwise), business, operations, assets, revenues, properties or prospects of any of the Borrower, and the Lender shall not have become aware of any facts or circumstances not previously known by it, other than those which customarily occur as a result of events leading up to and following the commencement of a case under chapter 11 of the Bankruptcy Code and the commencement of the Cases, which the Lender shall reasonably determine has, or could reasonably be expected to have, a Material Adverse Effect;

(h)     Such other conditions set forth in the DIP Loan Agreement.

Conditions to Additional Loans:

The obligation to provide additional loans shall be subject to the satisfaction of the following conditions:

(a)     The Lender shall have received from the Borrowers a modified or amended budget, satisfactory in form and substance to the Lender in its sold and absolute discretion;

(b)     No later than 30 days after the entry of the Interim Order, the Court shall have entered an order (the "Final Order") in form and substance satisfactory to the Lender in its sole and absolute discretion in accordance with the DIP Loan Agreement;

(c) The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended or stayed;

(d) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist;

(e) Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date;

(f) Receipt of a notice of borrowing from the Debtors; and

(g) Such other conditions set for in the DIP Loan Agreement.

The request by the Debtors for, and the acceptance by the Debtors of, each extension of credit under the DIP Loan Agreement shall be deemed to be a representation and warranty by the Debtors that the conditions specified above have been satisfied or waived.

Events of Default shall include the following:

(a) Failure by the Debtors to pay principal, interest, or other amounts when due;

(b) Breach by the Debtors of any of the negative covenants described above;

(c) Breach by the Debtors of any other covenant or agreement contained in the DIP Loan Agreement and such breach shall continue unremedied for more than ten days after notice by the Lender;

(d) Any representation or warranty made by the Debtors shall prove to have been incorrect in any material respect when made;

(e) Any of the chapter 11 cases shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee, a responsible officer or an examiner shall be appointed in any of the Cases and the order appointing such trustee, responsible officer, or examiner shall not be reversed or vacated within 30 days after the entry thereof; or any other superpriority

claim (other than the Carve-Out) which is <u>pari passu</u> with or senior to the claims of the Lender shall be granted in any of the chapter 11 cases or the Bankruptcy Court shall enter an order terminating the use of cash collateral referred to above;

(f)    The Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors which have an aggregate value in excess of $50,000;

(g)    A Change of Control (as defined in the DIP Loan Agreement) shall occur;

(h)    Any material provision of the DIP Loan Agreement or any other loan document shall cease to be valid and binding on the Debtors, or the Debtors shall so assert in any pleading filed in any court;

(i)    An order shall be entered reversing, amending, supplementing, staying for a period in excess of 10 days, vacating or otherwise modifying the Interim Order or the Final Order;

(j)    Any judgment in excess of $50,000 as to any post-petition obligation shall be rendered against the Debtors and the enforcement thereof shall not be stayed or there shall be rendered against the Debtors a non-monetary judgment with respect to a post-petition event, in each case, which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Debtors to perform their obligations under the DIP Loan Agreement;

(k)    The Debtors file a chapter 11 plan, or support any filed chapter 11 plan which is not supported by the Lender or which does not repay all Obligations to the Lender in full in cash on or before the Termination Date; or

(l)    Such other Events of Default set forth in the DIP Loan Agreement.

17.  Section 364 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)  If the trustee is authorized to operate the business of the debtor under sections 721, 1108, 1304, 1203, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b)  The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

(c)  If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(i)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(ii)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(iii)  secured by a junior lien and property of the estate that is subject to a lien.

(d)  (i)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --

(A)  the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior lien or equal is proposed to be granted.

11 U.S.C. § 364(a) through (d)(1).

18.     Generally, § 364(d)(1)(A) of the Bankruptcy Code requires a debtor to demonstrate that alternative sources of credit are not available under the other provisions of § 364. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Although there is "no duty to seek credit from every possible lender before concluding that such credit is unavailable," the statute obligates a debtor to show "by a good faith effort that credit was not available without the senior lien." Bray v. Shenandoah Fed. Savs. and Loan Assoc. (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986).

19.     Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case, and accord significant weight to the necessity for obtaining the financing. See e.g., In re Snowshoe, 789 F.2d at 1088; In re Ames, 115 B.R. at 40. For example, the need for a swift injection of cash to preserve a debtor's business satisfies the requirements of Bankruptcy Code § 364(d) when coupled with unsuccessful attempts to locate alternative financing. See In re Ames Dep't Stores, Inc., 115 B.R. at 40. See also In re Snowshoe, 789 F.2d at 1088 (primary facts supporting priming liens included lack of alternative financing sources and need to obtain prompt cash infusion to preserve value of debtor's business).

20.     As set forth below, it was impossible for the Debtors to obtain their Postpetition Financing on an unsecured basis, pursuant to §§ 364(a) and 364(b) of the Bankruptcy Code. Rather, the circumstances of these Cases required the Debtors to

obtain their financing under Bankruptcy Code § 364(c) and satisfy the requirements of such Bankruptcy Code sections. Accordingly, the Debtors request that the Court authorize them to enter into the DIP Loan Agreement and obtain the DIP Financing pursuant to the terms contained therein and the Interim Order and Final Order.

21. The Debtors have made a good faith effort to obtain Postpetition Financing pursuant to §§ 364(a) and (b) of the Bankruptcy Code. Aside from the Lender, the Debtors approached other financial institutions actively involved in the debtor-in-possession lending field. Based upon this exercise, the Debtors concluded that (a) unsecured financing on any basis would not be available, and (b) by virtue of the knowledge of the Debtors' businesses possessed by the Lender, the Debtors were able to negotiate a debtor-in-possession financing facility without experiencing the delays that would occur if a prospective lender not familiar with the Debtors were to conduct due diligence on the Debtor and their assets. Further, the Lender offered attractive economic terms which other prospective lenders would be unable to match including: (a) no commitment or other lending fees, (b) interest payable upon maturity (as opposed to monthly), and (c) use of cash collateral with no revolver or borrowing base formulas. Given these circumstances, the Lender is clearly the most attractive lending candidate. Accordingly, the Debtors believe that the Lender is offering Postpetition Financing on competitive terms which are capable of being swiftly implemented. The Debtors are comfortable the proposal is the best financing available to the Debtors.

22. The Debtors require working capital to continue to operate their businesses. The credit provided under the DIP Loan Agreement will enable the Debtors to obtain goods and services in connection with their operations, pay their employees, and

operate their businesses in an orderly and reasonable manner to preserve and enhance the value of their assets and an enterprise for the benefit of all parties in interest. The availability of credit under the DIP Loan Agreement will give the Debtors' vendors and suppliers the necessary confidence to resume ongoing credit relationships with the Debtors. Finally, the implementation of the DIP Financing should be viewed favorably by all parties in interest and thereby help promote successful chapter 11 cases.

23. The terms and conditions of the DIP Loan Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Accordingly, the Lender should be accorded the benefits of § 364(e) of the Bankruptcy Code in respect of the DIP Loan Agreement.

24. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to § 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

25. Pursuant to Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court conduct a preliminary expedited hearing (the "Interim Hearing") to enter the Interim Order authorizing the Debtors to fund working capital advances in an amount not to exceed $1,200,000, pending a final hearing on the Motion (the "Final Hearing"). This interim relief will maintain the Debtors' ongoing operations and avoid immediate and irreparable harm and prejudice to their respective estates and all parties in interest in these Cases.

26.    The Debtors have an urgent and immediate need for cash to continue to operate their businesses. Without cash to pay their vendors and providers, preservation of the Debtors as a going concern will be in significant jeopardy. The Debtors estimate that they need up to approximately $1,200,000 over the next 15 to 30 days in order to pay vendors and providers and satisfy other obligations incurred by the Debtors in the ordinary course of their businesses. The Debtors' businesses and properties will be immediately and irreparably harmed absent authorization from the Court to obtain secured credit on an interim basis, pending a final hearing on this Motion. Accordingly, the entry of the Interim Order is essential to maintain and restore confidence in the Debtors' ability to pay for goods and services and to maintain and restore customer confidence.

## Notice

27.    No trustee, examiner or creditors' committee has been appointed in the Debtors' chapter 11 cases. Notice of the hearing on this Motion has been provided to the Office of the United States Trustee, counsel to the proposed postpetition lender, and the holders of the twenty (20) largest unsecured claims against each of the Debtors. The Debtors submit that no other or further notice is necessary.

28.    No previous request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an interim and final order granting the relief requested herein and such other and further relief as is just and proper.

Dated: Wilmington, Delaware
      July 30, 2001

THE BAYARD FIRM

By:_____
    Jeffrey M. Schlerf (No. 3047)
    Christopher A. Ward (No. 3877)
    Eric M. Sutty (No. 4007)
    222 Delaware Avenue, Suite 900
    Wilmington, Delaware 19801
    (302) 655-5000

    Proposed Attorneys for the Debtors and
    Debtors-in Possession

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| AXISTEL COMMUNICATIONS, INC., | ) ) | Case No. 01- 10005 |
| NOVO NETWORKS GLOBAL SERVICES, INC., | ) | |
| NOVO NETWORKS INTERNATIONAL SERVICES, INC., | ) | (JJF) |
| E.VOLVE TECHNOLOGY GROUP, INC., | ) | |
| NOVO NETWORKS OPERATING CORP., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) ) | |

## INTERIM ORDER AUTHORIZING SECURED POSTPETITION FINANCING ON A SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. § 364

Upon the motion (the "Motion") dated July 30, 2001 of AxisTel Communications, Inc., Novo Networks Global Services, Inc., Novo Networks International Services, Inc., e.Volve Technology Group, Inc., and Novo Networks Operating Corp., debtors and debtors in possession (collectively, the "Debtors"):

(a) seeking this Court's authorization pursuant to §§ 105, 364(c)(1), 364(c)(2), and 364(c)(3) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), for the Debtors, inter alia, (i) to obtain secured postpetition financing (the "Postpetition Financing") consisting of a credit facility up to an aggregate principal amount not to exceed $1,600,000 (the "Commitments") from Novo Networks, Inc. (the "Lender"), and for the Debtors to execute a Credit and Guaranty

Agreement with respect to the Postpetition Financing (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"); and for the Debtors to execute a promissory note (the "Note") (the Credit Agreement, the Note, and all ancillary documents at any time executed in connection therewith, collectively, the "Credit Documents"); (ii) to grant the Lender, pursuant to Bankruptcy Code § 364(c), security interests in all of the Debtors' presently owned and after-acquired real and personal property to secure the Debtors' obligations under the Credit Documents and (iii) to grant the Lender, pursuant to Bankruptcy Code § 364(c), priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below;

(b) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001 (this "Order") authorizing the Debtors, inter alia, to utilize the Commitments for up to an aggregate of $1,200,000 upon the terms and conditions set forth in the Credit Documents and the Interim Order pending the Final Hearing referred to below; and

(c) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order authorizing on a final basis, inter alia, the Postpetition Financing (the "Final Order"); and due and sufficient notice of the Motion and the Preliminary Hearing under

2

the circumstances having been given; and the Preliminary Hearing on the Motion having been held before this Court on August 1, 2001; and the Court having entered the Interim Order at the conclusion of the Preliminary Hearing; and upon the entire record made at the Hearings and this Court having found good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND** that:

A.    On July 30, 2001, (the "Filing Date"), the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.    The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Postpetition Financing.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, to purchase and supply new inventory and otherwise finance their operations, is essential to the Debtors' continued viability.  In addition, the Debtors' critical need for financing is immediate.  In the absence of the Postpetition Financing, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates would occur. The preservation, maintenance and enhancement of the going concern value of the

3

Debtors are of the utmost significance and importance to a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.

D.      Given the Debtors' current financial condition, financing arrangements and capital structure, the Debtors cannot obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense. Financing on a postpetition basis is not otherwise available without the Debtors (i) granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below, and (ii) securing, pursuant to Bankruptcy Code § 364(c), such indebtedness and obligations with security interests in and liens upon the property described below, all in accordance with and subject to the terms of this Order and the Credit Documents.

E.      Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the Lender, and (iii) the creditors holding the 20 largest unsecured claims against each Debtor. Sufficient and adequate notice under the circumstances of the Preliminary Hearing and the relief requested in the Motion has been given pursuant to Bankruptcy Code §§ 102(l) and 364(c) and Bankruptcy Rules 2002 and 4001(c).

F.      The Postpetition Financing has been negotiated in good faith and at arm's length between the Debtors and the Lender, and any credit extended, letters of credit issued and loans made to the Debtors pursuant to the Credit Agreement shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

G.     The terms of the Postpetition Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2).  The permission granted herein to enter into the Postpetition Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.     The Motion is granted, subject to the terms and conditions set forth in this Order.

2.     The Debtors are expressly authorized and empowered to execute and deliver the Credit Agreement, the Note and any other Credit Documents to be executed and delivered in connection therewith.  The Debtors are authorized to comply with and perform all of the terms and conditions contained in the Credit Documents, and the Debtors are directed to repay amounts borrowed with interest to the Lender in accordance with and subject to the terms and conditions set forth in the Credit Documents and this Order.  All loans made under the Credit Agreement (the "Loans") and interest thereon,

and all fees, costs, expenses, indebtedness, obligations and liabilities of the Debtors to the Lender under the Credit Documents and this Order, are hereinafter referred to as the "Obligations."

3.     Pending the Final Hearing, the Debtors are expressly authorized to obtain Loans from the Lender, all on the terms and subject to the conditions set forth in the Credit Documents and this Order up to a total of $1,200,000 for working capital and other general corporate purposes in accordance with the Budget (as defined in the Credit Agreement).

4.     In accordance with Bankruptcy Code § 364(c)(1), subject only to the Carve-Out (as defined in paragraph 6 below), the Obligations shall constitute claims (the "Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and in accordance with 726, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code.  Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 506(c), 507(b) or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with, the Superpriority Claims of the Lender arising out of the Obligations.

5.     As security for the Obligations and subject only to the Carve-Out, the Lender shall have and is hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, deeds of trust, security

agreements, pledge agreements, financing statements or otherwise), valid and perfected, security interests in, and liens upon (the "Liens"), all present and after-acquired property of the Debtors of any nature whatsoever, including, without limitation, all leasehold interests of the Debtors, all cash contained in any account maintained by the Debtors and the proceeds of all causes of action, whether pursuant to federal law or applicable state law (except for the proceeds from any avoidance actions under chapter 5 of the Bankruptcy Code) of the Debtors or their estates (collectively with all proceeds and products of any or all of the foregoing, the "Collateral") as follows:

      (a)     pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Filing Date; and

      (b)     pursuant to Bankruptcy Code § 364(c)(3), a second priority, junior, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral which is subject to any validly perfected security interest or lien (i) in existence as of the Filing Date and that is not subject to Bankruptcy Code § 552(a), or (ii) a valid lien perfected (but not granted) after the Filing Date to the extent such perfection in respect of a pre-Filing Date claim is expressly permitted under the Bankruptcy Code and that is not subject to Bankruptcy Code § 552(a), or (iii) a valid perfected Lien that is a Permitted Lien (as defined in the Credit Agreement) and expressly permitted in the Credit Agreement to be senior to the Liens granted to the Lender in this Order to secure the Obligations.

      6.     Any provision of this Order or the Credit Agreement to the contrary notwithstanding, the Liens and Superpriority Claims granted to the Lender pursuant to the Credit Documents and/or this Order shall be subject and subordinate to a carve-out (the "Carve-Out") for (a) following the occurrence and during the pendency of a Default or an Event of Default, the payment of allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by the

Debtors, any statutory committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") and any disbursements of any member of such committees in an aggregate amount not to exceed $800,000 and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, (x) following the Termination Date (as defined herein and in the Credit Agreement), the Carve-Out for professional fees set forth in subsection 6(a) above shall be reduced by the amount of such allowed professional fees and disbursements paid at any time in the Chapter 11 Cases, and (y) the Carve-Out shall not include professional fees and disbursements incurred in connection with the commencement and prosecution of any adversary proceeding or contested matter in which any party asserts any claims or causes of action against the Lender and/or challenges or raises any defense to the Obligations, the Credit Documents, the Superpriority Claims and/or the Liens of the Lender granted hereto and in the Credit Documents. In addition, notwithstanding anything herein to the contrary, no Loans or any portion of the Carve-Out may be used to object to or contest in any manner, or raise any defenses to, the validity, perfection, priority or enforceability of the Obligations, the Credit Documents, the Superpriority Claims and/or the Liens of the Lender granted hereto and in the Credit Documents, or to assert any claims or causes of action against the Lender.

7. Except as set forth in paragraph 5 above, the Liens granted to the Lender pursuant to this Order shall be prior and senior to all liens and encumbrances of all other secured creditors in and to such Collateral granted, or arising, after the Filing Date (including, without limitation, liens and security interests, if any, granted in favor of any

federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors). Subject to entry of the Final Order and other than the Carve-Out, no claim shall be asserted by the Debtors under Bankruptcy Code § 506(c) for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Lender upon, the Collateral. The Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and liens, and the Lender shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, record leasehold mortgages, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Lender to take any of the foregoing or similar actions or the failure by the Debtors to execute any documentation relating to the Liens shall in no way affect the validity, perfection or priority of such Liens. If, however, the Lender, in its sole discretion, shall determine to file any such financing statements, notices of lien or similar instruments, record leasehold mortgages, or to otherwise confirm perfection of such Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

8.    The Lender is hereby released and discharged from any and all claims and causes of action of the Debtors arising prior to the Filing Date; except to the extent (a) a party in interest (including the Creditors' Committee) has properly filed an adversary

proceeding or contested matter (subject to the limitation set forth in the last sentence of decretal paragraph 6) no later than the date that is sixty (60) days after the date of appointment of the Creditors' Committee asserting any claims or causes of action against the Lender and (b) the Court rules (whether prior to or after such sixty (60) day period) in favor of the plaintiff in any such adversary proceeding or contested matter properly filed within such sixty (60) day period after the date of appointment of such Creditors' Committee.

9. As long as any portion of the Obligations remain unpaid, or any Credit Document remains in effect, the Debtors shall not seek, and it shall constitute an Event of Default (and automatic occurrence of the Termination Date) if (a) there shall be entered any order dismissing any of the Chapter 11 Cases, or (b) except as expressly permitted under the Credit Agreement there shall be entered in any of the Chapter 11 Cases, or any subsequent Chapter 7 case, any order which authorizes under any section of the Bankruptcy Code, including Bankruptcy Code §§ 105 or 364, (i) the granting of any lien or security interest in any property of the Debtors in favor of any party other than the Lender, or (ii) the obtaining of credit or the incurring of indebtedness that is entitled to superpriority administrative status equal or superior to that granted to the Lender pursuant to this Order; unless, in connection with any transaction cited in clause (i) or (ii) of this paragraph 9, such order requires that the Obligations shall first be indefeasibly paid in full in cash.

10. Upon the occurrence of and during the continuance of an Event of Default (as defined in the Credit Agreement), the Lender may (subject to the requirement to provide three (3) business days' prior written notice to the Debtors, the United States

Trustee and any statutory committees appointed in the Chapter 11 Cases and the Debtors' right to cure, each as set forth in the Credit Agreement), exercise rights and remedies and take all or any of the following actions without notice or modification of the automatic stay pursuant to Bankruptcy Code § 362 (which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate the Commitments and thereafter cease to make Loans to the Debtors (the date of any such termination, the "Termination Date"); (b) declare the principal of and accrued interest, fees and other liabilities constituting the Obligations to be due and payable ("Acceleration"); and/or (c) take any other action or exercise any other right or remedy permitted to the Lender under the Credit Documents, this Order or by operation of law. The Debtors waive any right to seek relief under the Bankruptcy Code, including without limitation, under Bankruptcy Code § 105, to the extent any such relief would in any way restrict or impair the rights and remedies of the Lender set forth in this Order and in the Credit Documents. All proceeds of Collateral and any other payments received by the Lender, after the Termination Date or pursuant to the exercise of any such rights and remedies upon the occurrence and during the continuance of an Event of Default, shall be applied to the Obligations in the manner set forth in the Credit Documents. In addition, upon the occurrence of the Termination Date, the Debtors' right to use cash collateral of the Lender shall terminate unless (and to the extent) the Lender expressly consents to such use in writing.

11. The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the

Credit Documents, as the Lender may reasonably require, as evidence of and for the protection of the Obligations, or which otherwise may be deemed reasonably necessary by the Lender to effectuate the terms and conditions of this Order and the Credit Documents, as the case may be. The Debtors and the Lender are hereby authorized to implement, in accordance with the terms of the Credit Agreement, any non-material modifications of the Credit Agreement without further Order of this Court.

12.     Having been found to be extending credit and making Loans to the Debtors in good faith, the Lender shall be entitled to the full protection of Bankruptcy Code § 364(e) with respect to the Obligations, Superpriority Claims and the Liens created or authorized by this Order in the event that this Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal or vacation of this Order shall not affect the validity of any obligation of the Debtors to the Lender incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all Loans made pursuant to this Order and the Credit Agreement and all Obligations incurred by the Debtors pursuant hereto or the Credit Documents prior to the effective date of such stay, modification, reversal or vacation, shall be governed in all respects by the original provisions hereof and the Lender shall be entitled to all the rights, privileges and benefits, including without limitation, the Liens and Superpriority Claims granted herein.

13.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases (and the Obligations shall not be discharged by the entry of any such order or pursuant to Bankruptcy Code § 1141(d)(4),

the Debtors having hereby waived such discharge); (b) converting any of the Chapter 11 Cases to a Chapter 7 case; or (c) dismissing any of the Chapter 11 Cases.

14.     The Debtors shall not, without the consent of the Lender, enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under § 546(g) of the Bankruptcy Code or consent to any creditor taking any set-off against any of its prepetition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise.

15.     The provisions of this Order shall be binding upon and inure to the benefit of the  Lender, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases as a legal representative of the Debtors or the Debtors' estates.

16.     The Debtors shall, on or before August 6, 2001, mail copies of a notice of the entry of this Order, together with a copy of this Order, a copy of the Motion and a copy of the Credit Agreement (without Exhibits), to the parties having been given notice of the Preliminary Hearing, to the creditors holding the 20 largest unsecured claims against each Debtor, to any party which has filed prior to such date a request for notices with this Court and to counsel for any statutory creditors' committee appointed pursuant to Bankruptcy Code § 1102.

17.     The notice of entry of this Order shall state that any party in interest objecting to the Postpetition Financing shall file written objections with the United States Bankruptcy Court Clerk for the District of Delaware no later than August 29, 2001 at 12:00 noon, which shall be served so that the same are received on or before such date by: (a) counsel to the Debtors, The Bayarrd Firm, 222 Delaware Avenue, Suite 900,

Wilmington, Delaware 19801 Attention: Jeffrey M. Schlerf, Esq., (b) counsel to the

Lender, White & Case LLP, 200 South Biscayne Boulevard, Miami, Florida 33131

Attention: John K. Cunningham, Esq., and (c) the Office of the United States Trustee.

18.    The Final Hearing to consider the Motion will be held on September 5,

2001 at 10:30 a.m.

19.    In the event of any inconsistency between the terms of this Order or the

terms of the Credit Documents, the terms of this Order shall control.


Dated: Wilmington, Delaware
       August ___, 2001



_____
The Honorable Joseph J. Farnan, Jr.
United States District Court Judge